# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:15-CR-3-TLS |
| | ) | |
| DONALD CUPP | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant Donald Cupp's Motion to Suppress [ECF No. 17], filed on March 11, 2015. In his Brief in Support [ECF No. 36], the Defendant argues that the vehicle he was driving on January 15, 2015, was stopped in violation of his Fourth Amendment rights. He requests that the Court suppress the drugs recovered from the vehicle, as well as any post-arrest statements he made the following day. The Government responds that the officers had a reasonable suspicion that the vehicle contained drug evidence, and notes that the registered owner of the vehicle had an outstanding warrant for his arrest. The Government submits that the drugs were recovered pursuant to an appropriate inventory search incident to a tow of the vehicle. For the reasons set forth in this Opinion and Order, the Court will deny the Defendant's Motion.

## BACKGROUND

By way of an Indictment filed on January 28, 2015, the Government charges that, on January 5, 2015, the Defendant knowingly and intentionally possessed with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). After Cupp filed a Motion to Suppress, the Court conducted evidentiary hearings on May 18 and August 12, 2015. Cupp was present and represented by attorney Thomas N. O'Malley. The Government was represented by

Assistant United States Attorney Anthony Geller. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs.

**FINDINGS OF FACT**

Upon consideration of the credibility of the witnesses and the examination of the evidence, the Court makes the following findings of fact.

**A.    The Investigation**

In June 2014, a drug task force began an investigation after Allen County Police Department (ACPD) Detective Brian Sell received an anonymous tip. The tipster said that Cupp, who lived near I-69 between State Roads 24 and 14, had been recently released from prison and was stealing lawn mowers and motorcycles, and was possibly dealing methamphetamine. Detective Sell knew Cupp had an extensive criminal history that included theft and drugs.[1]

As part of his investigation of Cupp, in October 2014, Detective Sell learned about an incident from law enforcement in another county. Officers from Lagrange County had pursued two white, male suspects stealing a lawnmower and fleeing in a white cargo van. The suspects crashed the van and fled on foot. One of the suspects was described as being large in stature with long hair and a beard. Inside the van, officers found mail addressed to Cupp at a residence on

---

[1] According to a Pretrial Services Report [ECF No. 12], Cupp was sentenced to four years of probation in 1989 for trafficking in cocaine or marijuana. This was followed up in the 1990s with various convictions for breaking and entering, and auto theft. In 2002, Cupp was adjudged guilty of possession of methamphetamine, and in 2006 he was charged again with possession of methamphetamine and possession of burglary tools. More charges related to theft or receiving stolen property followed in 2006 and 2007. In 2008, Cupp was found guilty of possession of methamphetamine and criminal conversion. Cupp faced additional theft and burglary-related charges in 2010.

2

Bass Road in Fort Wayne, Indiana. This address was consistent with the area described by the tipster. Also in October, Detective Sell received information from a known informant with an established record of providing credible and reliable information in other cases. The informant had been caught shoplifting watches for Cupp. He stated that in summer 2014, he was living off-and-on with Cupp and a woman at this same residence on Bass Road, and that Cupp was providing the informant with stolen materials to scrap for money. According to the informant, Cupp would leave for several days at a time and come back with large amounts of cash and crystal methamphetamine. Cupp bragged that the cash was what you got by selling drugs instead of using them. Cupp would then hold parties at his house and supply the attendees with methamphetamine.

The informant also relayed that Cupp had requested his help unloading a stolen ATV from a white van and putting it in a barn at a residence on Yellow River Road. The police later obtained a search warrant for the residence based on surveillance, other tips, and knowledge about the homeowner. The search led to the recovery of stolen motorcycles and motorcycle parts.

The informant told Detective Sell about another incident involving the white van. He said that a man, who police later identified as "Big John" Barringer, came to the house in the white van and picked up Cupp and another individual who had been in and out of the house. Cupp and Barringer returned several hours later without the van. Both men shaved their beards, and Barringer cut his long hair.

## B. Surveillance, Pole Camera, and GPS Tracker

On November 7, 2014, officers installed a pole camera in a public area that had a view of the Bass Road residence. Detective Sell testified about a pattern of activity at the Bass Road residence:

> [T]here was a lot of traffic that would be coming and going, staying for short periods of time and leaving, all hours of the night, typically during the day not so much, but typically mainly in the evening and night hours, which through . . . experience [we] learn is very typical for narcotics trafficking households, continuing enterprise.

(Tr. I 24.) Additionally, some of the vehicles were registered to people known by police to be in possession of, or to traffic in, narcotics. (*Id.* 38.)

On November 30, 2014, officers saw a motorcycle enter the Bass Road property. Through the pole camera footage, officers saw Cupp come out to meet the man and pull what looked like a large amount of cash out of his pocket. Cupp gave the cash to the man on the motorcycle, who then left the property.

Justin Lock became a part of the investigation after his blue Ford Taurus was spotted at the house during surveillance. According to Detective Sell, the task force had "received information through other surrounding counties that [Lock] was involved in the trafficking of methamphetamines and also the, I guess, pawning or trading of ATV's lawn mowers, things like that for methamphetamine, stolen ATV's and lawn mowers and such." (*Id.* 26.) Police also observed Megan Ewell stay at the house and come and go on a regular basis.

On December 5, 2014, members of the task force started seeing Cupp drive a white, GMC Envoy with a temporary license plate registered to him at the Bass Road address. Police also saw the Envoy at the Yellow River Road address, and Cupp began going to that residence

4

more often. Police obtained a warrant to place a GPS tracker on the Envoy. Within the course of a couple days in early January, Cupp drove the Envoy to a home in Steuben County, a home in the Tri-Lakes Shriner Lake area, and at least one residence in Grand Rapids, Michigan. The Steuben County residence belonged to an individual who was already under investigation by another drug task force agency. A cooperating individual was purchasing methamphetamine out of that household. Detective Sell testified that the task force learned from the Whitley County Sheriff's Department that the home in the Tri-Lakes area "was also a well-known address for crystal methamphetamine use and trafficking." (*Id.* 33.) The Michigan State Police had received tips about the residence in Grand Rapids being connected to drug trafficking.

C.  **Seizure of Methamphetamine**

On January 5, 2015, ACPD Officer Warren Coonrod was assisting in the investigation of Cupp by watching video from the pole camera. He noted that a suicide call came from Bass Road. He alerted Lieutenant Vaughn, and they both began watching the camera. They saw a light colored Buick ram into a dark colored Ford and drive away. Cupp had called 911 to report that his girlfriend, Ewell, was suicidal and had cut herself.

Officer Angela Spahiev, who was a trained crisis intervention team (CIT) officer, responded to the dispatch of the 911 call. Officer Spahiev made contact with Ewell at around 6:30 P.M. after the Buick was discovered a few miles from the Bass Road residence in a store parking lot. Officer Spahiev noticed that Ewell's arm had some marks on it that appeared to be fresh, but they were not deep cuts. According to Officer Spahiev, when someone has cuts, CIT officers decide to have them evaluated "just to be on the safe side," even if the cuts are not deep.

5

(Tr. I 62–63; *see also id.* at 63 (testifying that she knew she was going to transport Ewell to the hospital for an assessment so as to protect the department)).) Officer Spahiev testified that Ewell "was very upset. She wasn't concerned about the cuts or anything. She was just upset with [Cupp]. She said he hadn't been staying at the home with her, and she was upset about—I guess they were having relationship issues, so she told me that she did that to kind of get his attention." (*Id.* 63.) Ewell continued to confide in Officer Spahiev, and made comments about Cupp having drugs at the house or in his vehicle. Officer Spahiev communicated with the narcotics officers by text message. Officer Spahiev transported Ewell to the hospital in her squad car, which was equipped with an in-car camera.

Officer Eric Foster, who is also a CIT officer, responded to the Bass Road residence. He made contact with the complaining party—Cupp—who reported that his girlfriend had gotten into an argument with him, had threatened suicide, and had left the residence in a white Buick. He reported that she had broken a few items and, at one point, had a knife. She had also hit Lock's vehicle as she left. When Officer Foster left, he went to the store parking lot where Officer Spahiev was located, and learned that she was transporting Ewell to the hospital for an evaluation. Officer Foster went to a nearby park to write his report and to relay the details of his encounter with Cupp to the narcotics officers.

Meanwhile, Detective David Schmidt, at the direction of Lieutenant Vaughn, had started watching the video feed from the pole camera and relaying the information to the other officers. Detective Schmidt observed some activity outside the house. He saw a man come out of house and open doors to the Envoy and the Taurus and return to the house. A short time later, the man went to the Envoy again and sat inside it. He then walked to the Taurus and accessed the rear

6

passenger and driver's side doors. The third time he appeared, the man accessed the passenger side of the Taurus, walked over to the passenger side of the Envoy, and carried a computer-type bag to the Taurus, which he put behind the driver's seat.[2] The man then left the residence in the Taurus. Given the darkness and the location of the pole camera, and the fact that Detective Schmidt did not know Cupp by sight, he could not tell whether the man was Cupp.

As he was parked to write his report, Officer Foster learned that the blue Ford Taurus left the Bass Road residence. Officer Foster then saw a blue Ford Taurus going westbound on Bass Road and he started to follow it. Through radio communication, narcotics officers stated that Officer Bleeke would be conducting a stop, but that Officer Foster could assist if he was in the area. Officer Foster advised that he was already behind the vehicle. Officer Foster ran a computer check on the license plate, and it came back to Lock, who had an active arrest warrant. Officer Foster could not see who was driving the Taurus.

Lieutenant Vaughn directed Officer Bleeke to stop the Taurus. Lieutenant Vaughn suspected that Cupp was driving the Taurus, but could not eliminate that it might have been Lock who was driving. Officer Bleeke believed that the reason for the stop was because the owner of the vehicle, Lock, had a warrant for his arrest. Once the Taurus was stopped, Officer Bleeke approached and asked for the driver's license, registration, and proof of insurance, while Officer Foster hung back. The driver—who was Cupp, not Lock—was not able to provide

---

[2] At the evidentiary hearing and in his post-hearing briefing, Cupp calls attention to the fact that the Envoy's dome light did not light up the third time that the man appeared and walked to the passenger side of the Envoy, and then walked to the Taurus with a bag. Because the Envoy's dome light had been activated the other two times that he accessed the vehicle, he argues that the bag could not have come from the Envoy. Of course, the bag could have been placed on the ground during one of the other times Cupp accessed the Envoy. Moreover, even if it was not inside the Envoy immediately before being placed in the Taurus does not alter the analysis.

Officer Bleeke with a registration or proof of insurance. Because Cupp was not allowed to drive without proof of insurance, Officer Bleeke prepared to have the Taurus towed. He advised Cupp that he could take whatever items he needed out of the car and leave, and that the remainder of the items in the car would be inventoried. Officer Bleeke advised that an owner of the car, with proof of insurance, could claim the vehicle once it was towed. Cupp removed his dog and some items of clothing from the car.

When Officer Bleeke performed the inventory search, he located a black bag behind the driver's seat. The bag contained a bag of crystal methamphetamine, a folder or notebook, and a scale.

## CONCLUSIONS OF LAW

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809–10 (1996).

Police officers are justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "A *Terry* investigative stop is 'a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011) (quoting *United*

*States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) ). Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also Bullock*, 632 F.3d at 1012 (noting that reasonable suspicion deals with probabilities, not hard certainties). It is a "commonsense, nontechnical" concept that deals with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. at 21–22). When officers are in communication regarding a suspect or are working together at a scene, the knowledge of one officer may be imputed to the other officers under the collective knowledge doctrine. *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000); *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) ("The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action.").

      The Court concludes that the task force's investigation of Cupp led to reasonable articulable suspicion that he was dealing drugs from his residence and had also been stealing lawnmowers, ATV's, and motorcycles. The informant's observations, police surveillance, video of his residence, the GPS tracker on his vehicle, and statements from Cupp's girlfriend all contributed to the specific and articulable facts giving rise to the suspicion. The police also had

9

reasonable suspicion to believe that Cupp was attempting to move evidence of his unlawful activities from the Bass Road location soon after the police had visited the location in response to a 911 call.

A.       **Information From Tipster and Informant**

Cupp disagrees that the police had a lawful basis to conduct the traffic stop. First, he argues that the officers did not have reasonable suspicion because they were not entitled to rely on the information provided by the tipster or the informant. According to Cupp, because the only information provided by the informant that was corroborated was information unrelated to drug dealing, it cannot be used to support reasonable suspicion of drug dealing. For example, with respect to the Lagrange County incident with the stolen lawnmower, he asserts that "[u]nless the government has shown some unknown statistic which can tie drug dealing with owning a stolen Lawn Boy or Toro lawn mower, there is simply no logical correlation between stealing a lawn mower and drug dealing." (Def.'s Reply 2, ECF No. 40.) No such statistical connection is necessary; the Supreme Court has given "credit to the proposition that because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Alabama v. White*, 496 U.S. 325, 331 (1990). The informant was right when he indicated that Cupp was stealing, making it more likely that he was also right about Cupp's drug activity.

Cupp also argues that the white van has never been linked to him because, despite the fact that mail was found in the van, and addressed to him at Bass Road, the police did not testify regarding the date of the post marks on the mail. However, there is no evidence in the record

suggesting that the mail was so outdated as to no longer evidence a reasonable link. Nor does Cupp indicate how old would be too old. Moreover, crediting this argument would improperly move the concept of reasonable suspicion into the realm of hard certainties and hyper-technicalities. "[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *White*, 496 U.S. at 330.

Cupp disputes that the description of the fleeing suspects implicates him because he is not large in stature and does not have long hair and a beard. That may be. But the description does match that of an associate of Cupp's; specifically, a man that the informant saw arrive at Cupp's residence in a white van. He observed both men leave in the van, and return several hours later without the van. The large man then cut his long hair and both men shaved their beards.

Next, Cupp challenges the informant's statements that Cupp was selling scrap and fencing watches as unlikely activity for a drug dealer to be engaged in. He asserts that such small-time fencing "seems inconsistent" with the informant's assertion that Cupp would come back to the house with large amounts of cash and crystal methamphetamine after being gone for several days. (Def.'s Reply 4, ECF No. 40.) Cupp questions why he would resort to stealing and fencing if he had so much money from drug dealing. This was not a question the police had to answer before they could give credence to the informant's statements. They knew that Cupp had a history of theft, burglary, and possession of methamphetamine. They also knew that the informant had a good track record for credibility, and that he was purporting to speak from firsthand observation when he detailed a specific instance where Cupp asked him to help unload a stolen ATV for storage at a particular address. Later, when police were able to search that

11

address, they found stolen motorcycle parts and at least one stolen motorcycle. Thus, the exact residence the informant provided was found to be a storage place for stolen items of a similar nature, further bolstering his credibility.

What is more, the police did not rely solely on the informant. They conducted their own surveillance of Cupp's residence, which is discussed below.

B.     **Police Surveillance**

Police observed traffic coming and staying for a short period of time, typically in the evening and night hours. Not only was this pattern suspicion, but some of the vehicles were registered to people known by police to be in possession of drugs or known to be narcotics traffickers.

Cupp disputes that there was anything suspicious in the activities the police observed. He contends that the testimony regarding heavy traffic with short visits is meaningless because Girl Scouts, Boy Scouts, Jehovah Witnesses, and Mormons making their pitches would all meet this description. He points out that no officer observed illegal activity. These arguments are not convincing.

First, officers are not required to actually witness drugs to have reasonable suspicion that they are present. *See United States v. Ruiz*, 785 F.3d 1134, 1143 (7th Cir. 2015) ("[A] drug dealer who hides his merchandise from public view is not thereby rendered immune from a narcotics-based *Terry* stop."). Second, identifying possible innocent explanations for the observed activity ignores the totality of circumstances that existed in this case. A "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United*

*States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007) (holding that "even when innocent explanations exist for individual factors taken separately, reasonable suspicion may arise when the factors are taken together"). In forming a reasonable belief that ongoing drug activity was occurring, the police were permitted to view the events through the prism of their training and experience. *Bullock*, 632 F.3d at 1013 (short visits at various residences were considered by experienced officer to be consistent with activities of a drug courier or distributor). Detective Sell testified that, in his experience, the activity was typical for households where narcotics trafficking was taking place. The totality of factors known to the task force included not only their own observations, but the informant's statement, based on his first-hand observation, specifically identifying Cupp as a drug dealer. Further, some of the vehicles making the short visits belonged to people known to be involved with drugs. In this context, the common-sense conclusion reached by a reasonably prudent person would be that numerous, short stay visits, especially during evening hours, is not likely attributable solely to door-to-door sales calls or missionary visits. *See Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2011) ("[A] court's determination of reasonable suspicion must be based on common-sensical judgments and inferences about human behavior.") (quotation marks omitted).

Cupp's travel, tracked by GPS just days before his arrest, provided further objective justification for the officers' suspicions that Cupp was trafficking methamphetamine. He drove to a home in Steuben County where a cooperating individual was purchasing methamphetamine as part of a separate task force's investigation. The Whitley County Sheriff's Department informed the task force officers that the home in the Tri-Lakes area was a well-known address for methamphetamine use and trafficking. In addition, the Michigan State Police had received

tips about the residence in Grand Rapids being connected to drug trafficking.

**C.     Stop of the Taurus**

While the investigation led the task force officers to reasonably suspect that Cupp was dealing drugs and involved in theft, the events of January 5 led them to suspect that he was transporting evidence of his illegal activity from the residence.

On January 5, 2015, officers responded to a 911 call Cupp placed when his girlfriend threatened suicide. Afterwards, when police were monitoring the pole camera video, they saw a man moving items around between the Envoy and the Taurus, and then place a bag in the Taurus and leave. Just as it was reasonable for the police to believe that Cupp concealed drugs and other contraband related to his illegal activity at his residence, it was reasonable for the police to believe that he would want to remove the evidence from the premises in light of the 911 call and the resulting police contact. When they observed a man at the Bass Road residence place a computer-sized bag in the vehicle and drive away, they had articulable grounds to believe it contained drugs or evidence of drug activity. This was further bolstered by Ewell's statements to Officer Spahiev. The following is a excerpt of their exchange:

| Megan: | He was pissed I wouldn't give him the keys so he could leave….all that bullshit, bullshit. |
| --- | --- |
| Spahiev: | What do you mean? He got like 5 cars? |
| Megan: | Right, and he wants that one with all the stuff in it, all the dope in it (turns her head and mumbles (inaudible) |
| Spahiev: | With all his what? |
| Megan: | Dope. All his money, all his clothes, all his tools, all his everything. |

14

| | |
|---|---|
| Spahiev: | So is the truck at the house then? |
| Megan: | I think so….I…(inaudible)…he only got there for a manner of minutes and started throwing a fit……trying to sleep………my life's hard enough, for him to come home and do this to me? |

(Govt.'s Ex. 2). Ewell also stated that Cupp knew her belief that he would be going to jail for everything he had at the house. When Officer Spahiev pressed her about what kind of stuff, she answered that she did not know, and did not know what was there anymore because he had left her overnight and moved most of his stuff.

Cupp submits that the police were not entitled to rely on Ewell's statements as a predicate fact forming the necessary reasonable suspicion. He argues that her actions prior to police contact show her to be irrational and dysfunctional. He also maintains that even if Ewell's comments are credited, they stand for the fact that she did not know what drugs, if any, were located at the residence or in the Envoy. The Court finds that even if Ewell did not pinpoint the exact location of drugs or know how much contraband may have been at Bass Road, her statements were part of the totality of factors that a reasonable officer could consider. She was in a relationship with Cupp and lived at the residence the task force was investigating. She referred, not only to his dope, but to his money, clothes, and tools. That she may have hedged on, or been unsure about, the location of items and what still remained at the house did not negate the fact that she believed he had items at the house for which he could go to jail. That she responded in an emotionally unstable manner during a fight with her boyfriend did not hamper her ability to observe those items. Officer Spahiev did not think that Ewell was intoxicated or high, and a review of Officer Spahiev's in-car video reveals that Ewell articulated numerous rational concerns throughout her conversation with Officer Spahiev, including whether she would be able

15

to attend a pre-scheduled court appearance the next day and why she was in a relationship with a person who did not seem to care for her. Accordingly, the officers were entitled to give her statements some weight.

Already suspecting Cupp of dealing drugs from the Bass Road residence, the police had more than a hunch that he, or an associate of his, was removing evidence of criminal activity from the residence when they observed a man place a bag into the back seat of the Taurus. Whether the man moving the objects around and leaving in the Taurus was Lock or Cupp makes no difference to whether the police had reasonable suspicion that the bag contained evidence of illegal activity. In addition, if the driver was Lock, as Officer Bleeke believed, the stop was further justified by the fact that he had a warrant for his arrest. The stop did not violate the Fourth Amendment, and there is no basis to suppress the items found during the subsequent inventory search.

As an aside, Cupp takes the position that a *Terry* stop is justified only if there was reasonable articulable suspicion that he was "presently engaged in criminal activity." (Def.'s Br. in Support 15, ECF No. 36.) This is not an accurate statement, as "officers can stop and detain a suspect for reasonable suspicion that the suspect has engaged in a completed felony." *Bullock*, 632 F.3d at 1014; *United States v. Hensley*, 469 U.S. 221, 229 ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in . . . a completed felony, then a *Terry* stop may be made to investigate that suspicion."). In any event, mere possession of drugs would be illegal.

## CONCLUSION

For the reasons stated above, the Court DENIES the Defendant's Motion to Suppress [ECF No. 17]. By separate order, the Court will set dates for the Final Pretrial Conference and Trial.

SO ORDERED on March 7, 2016.

s/ Theresa L. Springmann<br>
THERESA L. SPRINGMANN<br>
UNITED STATES DISTRICT COURT<br>
FORT WAYNE DIVISION